IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| GREGORY LUCAS,<br><br>                    Plaintiff,<br><br>vs.<br><br>CARLY HILLENBRAND, et al.,<br><br>                    Defendants. | CV 25-24-BU-DWM<br><br><br>ORDER |

This civil rights action arises out of Plaintiff Gregory Lucas' involuntary

commitment to the Montana State Hospital in Warm Springs, Montana ("Warm

Springs") and the subsequent acts of violent self-harm and attempted suicide that

followed his allegedly premature discharge.  In February 2025, Lucas sued the

State of Montana ("Montana"); twelve individual state employees[1] ("Individual

State Defendants"); the following nine companies that provided staffing at Warm

Springs: SHC Services, Inc. and Supplemental Health Care[2] ("Supplemental

Health Care"), Prime Time Healthcare, LLC ("Prime Time"), Maxim Healthcare

---

[1] Carly Hillenbrand, Susan DePasquale, Kara O'Connell, Rhonda Damschen, Dorcas Parks, Kimberly Johnson, Sara Tarvin, Gabriel Farris, Paul Dever, Audrey Mattson, Dianne Adams, and Eric Fenchak.
[2] "SHC Services, Inc., d/b/a Supplemental Health Care."  (Doc. 47 at 1.)

1

Staffing Services, Inc. and Amergis Healthcare Staffing, Inc. (together, "Maxim"),[3] Aya Healthcare, Inc. ("Aya"), Prairie Travelers, Inc. ("Prairie Travelers"), Worldwide Travel Staffing, Ltd. ("Worldwide Travel"), and Sunbelt Staffing, LLC ("Sunbelt"); twelve individual Prime Time employees; four individual Supplemental Health Care employees; six individual Aya employees; two individual Sunbelt employees; and a single employee of Prairie Travelers, Mary Herndon, a.k.a. Mary Kline.  (Docs. 1, 3.)  Of the 48 defendants named, Maxim, Sunbelt, and Montana answered.  (*See* Docs. 8, 11, 16.)  Supplemental Health Care, Prime Time, Aya, Prairie Travelers, Herndon, and the Individual State Employees filed, (*see* Docs. 5, 9, 17), or joined, (*see* Docs. 7, 15, 24), a motion to dismiss.  The motions to dismiss were granted, and Lucas was given leave to amend.  (Doc. 34.)

Following amendment, the remaining defendants are Montana and the Individual State Defendants (together, "State Defendants"), and Prime Time, Supplemental Health Care, Aya, Maxim, and Sunbelt (together, "Corporate Defendants").  (Doc. 41.)  Lucas alleges federal and state law claims.  (*Id.*)  In response to the Second Amended Complaint, State Defendants have moved to dismiss all claims.  (Doc. 49.)  Corporate Defendants have filed a partial motion to

---

[3] "Amergis Healthcare Staffing Inc., f/k/a Maxim Healthcare Staffing Services, Inc."  (Doc. 47 at 1.)

dismiss, seeking dismissal of only the federal claims.  (Doc. 47.)  For the reasons provided below, both motions are granted, supplemental jurisdiction over Lucas' state law claims is declined, and Lucas is not granted leave to amend.

**BACKGROUND**

At this stage of the proceeding, Lucas' factual allegations are assumed to be true and construed in the light most favorable to him.  *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1114 (9th Cir. 2021).

## I.   Factual Background

Lucas' Second Amended Complaint is 106 pages long and contains a factual recitation of 60 pages.  Nearly every factual allegation in this pleading is restated below to highlight Lucas' failure to plead a constitutional violation.

### a.  First Episode of Psychosis

On April 18, 2023, Lucas was taken to St. Vincent Hospital after he contacted law enforcement, claiming to be poisoned and making suicidal threats such as "I'm getting ready to be with Jesus," and "can you kill me?"  (Doc. 41 at ¶ 15.)  At that time, Lucas was suffering from both visual hallucinations and extreme paranoia, and reported that his daughter, Andrea Bouchard, was trying to kill him.  (*Id.* ¶ 16.)  He reported "a history of head injuries with loss of consciousness," one of which occurred "approximately one month before he was taken to St. Vincent."  (*Id.* ¶ 18.)  Prior to April 2023, Lucas had never suffered psychosis or any other mental health issues.  (*Id.* ¶ 19.)

3

### b. St. Vincent Hospital

Between April 18 and April 28, 2023,[4] Lucas was placed on an involuntary hold at St. Vincent during which medical providers attempted to stabilize him. (*Id.* ¶ 20.) On April 19, while placed in observation services, Lucas was diagnosed with acute encephalopathy. (*Id.* ¶ 21.) At this time, outpatient services were recommended. (*Id.* ¶ 22.) However, Lucas continued to experience hallucinations and paranoia, (*id.* ¶ 25); experienced suicidal ideations, dramatic mood swings, paranoid delusions, and episodes of catatonia, (*id.* ¶¶ 27, 29–31); refused psychiatric medications on numerous occasions, (*id.* ¶¶ 27, 35); only ate packaged foods, (*id.* ¶ 35); and "did not see anything wrong with his behavior," (*id.* ¶ 24). St. Vincent providers noted that Lucas' behavior may have been exacerbated by his Ambien use. (*Id.* ¶¶ 28, 33.) Considering these factors, it was then recommended that Lucas receive inpatient care. (*Id.* ¶ 26.)

### c. Warm Springs

On April 28, 2023, the Yellowstone County Attorney's Office petitioned to have Lucas involuntarily committed and he was transported to Warm Springs. (*Id.* ¶¶ 39, 41, 44.) Contrary to information from St. Vincent regarding Lucas' Ambien

---

[4] The Second Amended Complaint both refers to Lucas' hold being from April 18, 2023 to April 28, 2023, and from April 18, 2023 to April 24, 2023. (*Compare* Doc. 41 at ¶ 20 *with id.* ¶¶ 23, 26.) However, a 90-day involuntary commitment at Warm Springs expiring on July 28, 2023, (*id.* ¶¶ 42, 43), would have begun on April 28, 2023.

use, his "first and second diagnosis" at Warm Springs were "'[o]ther psychoactive substance abuse with intoxication delirium' and 'opioid abuse, uncomplicated.'" (*Id.* ¶ 46.)

### i. Intake and Treatment Plan

During his intake, Individual State Defendant Susan DePasquale, a psychiatric advanced practice registered nurse, (*id.* ¶ 556), performed a psychiatric evaluation of Lucas, (*id.* ¶ 47). This evaluation incorporated incorrect information, including a note referring to another patient,[5] and that Lucas had driven himself to Warm Springs because he was concerned that his doctor was trying to poison him. (*Id.* ¶ 48.) During this evaluation, Lucas "was still suffering from psychosis" as evidenced by his statement that he was sent to Warm Springs because the St. Vincent doctors "'were unhappy with him.'" (*Id.* ¶ 51.) However, DePasquale failed to recognize this and reported no signs of psychosis. (*Id.*) Further, despite St. Vincent records regarding Lucas' Ambien usage, DePasquale observed that Lucas' "recent drug induced psychosis from prescribed [Ambien] and oxycodone use appeared to be resolving," (*id.* ¶ 50), and diagnosed him with "delirium due to a known psychological cause," (*id.* ¶ 53). Although DePasquale did note Lucas'

---

[5] This note states that "[a]ccording to the recent SJH record she had been working in a diner but had been unable to hold on to employment with her mental illness. Mention was made of living on a disability income." (Doc. 41 at ¶ 48.)

history of head injuries accompanied by a loss of consciousness, including his most recent injury about one month prior to admission, she did not "make any effort" to have Lucas "evaluated for a traumatic brain injury." (*Id.* ¶ 54.)

DePasquale's resultant "Treatment Plan" set a four-week period of treatment with a target completion date of May 27, 2023. (*Id.* ¶ 98.) The Treatment Plan classified Lucas as "a Level Red of supervision," (*id.* ¶ 56), and required fifteen-minute checks, (*id.* ¶ 55), and weekly progress notes, (*id.* ¶ 99). It further provided that Individual State Defendant Carly Hillenbrand, an advanced practice registered nurse, (*id.* ¶ 510), was to meet with Lucas once a week "to educate him about his medications and symptoms of psychosis," (*id.* ¶ 106), and that the treatment team would meet with him at that same interval, (*id.* ¶ 108). The Treatment Plan also included a determination by Individual State Defendant Gabriel Farris, a registered nurse, that nursing staff was to monitor Lucas' mental status, including anxiety, memory loss, confusion, depression, restlessness, lethargy, or stupor. (*Id.* ¶ 104.)

Montana State Hospital policies establish three levels of supervision: red, yellow, and green. (*Id.* ¶¶ 57–59.) All admitted patients begin on Level Red, which includes, *inter alia*, close monitoring and restricted movement. (*Id.* ¶ 57.) Advancing to Level Yellow allows for attendance of activities outside a patient's unit with an escort. (*Id.* ¶ 58.) Advancing to Level Green allows for attendance of activities around the hospital campus without an escort. (*Id.* ¶ 59.) A patient must

advance to Level Green before discharge. (*Id.* ¶ 60.) The fifteen-minute checks required staff to note the patient's location, status as asleep or awake, mood, rule compliance, appetite, and hygiene. (*Id.* ¶ 66.)

Hillenbrand did not undertake sufficient efforts to investigate and diagnose Lucas' psychosis. (*Id.* ¶ 71.) Despite the obvious indications that something beyond medical overdose was causing Lucas' psychosis, Hillenbrand recited and documented a diagnosis of "psychosis secondary to medication overuse" in Lucas' "Integrated Summary." (*Id.* ¶¶ 70–71, 75.) The course of treatment based on this incorrect diagnosis resulted in a failure to treat Lucas' underlying condition, which was ultimately determined to be compound traumatic brain injuries. (*Id.* ¶¶ 70–74.) Consistently, this course of treatment was insufficient to adequately stabilize Lucas prior to his discharge from Warm Springs. (*Id.* ¶ 76.) Individual State Defendant Rhonda Damschen, a medical doctor ("Dr. Damschen"), (*id.* ¶ 514), also conducted an intake exam and diagnosed Lucas with acute encephalopathy, (*id.* ¶ 77). She noted that there was no record of an MRI, but she did not order one and did not neurologically evaluate Lucas. (*Id.*)

Overall, the Treatment Plan was "inadequate" for numerous reasons. (*Id.* ¶ 105.) For example, weekly progress notes are too infrequent to address the needs of patients, reflect the condition of psychosis, or make timely changes to the plan. (*Id.* ¶¶ 100–03.) And although treatment plans should be "created and

7

implemented within a few days of admission," Hillenbrand and Farris did not

execute Lucas' Treatment Plan until May 15, 2023, (*id.* ¶ 110), and Individual

State Defendants Kara O'Connell, a social worker, (*id.* ¶ 559), and Sara Tarvin, a

rehabilitation therapist, (*id.* ¶ 69), did not execute it until May 16, 2023, (*id.* ¶ 111).

### ii. Symptoms and Care

On May 2, 2023, Lucas experienced what Warm Springs noted to be "an

episode of non-responsiveness and bizarre stereotypical behavior," which the staff

believed to be a stroke. (*Id.* ¶ 78.) The next day, Lucas denied the events of the

previous day and accused Hillenbrand of "having hallucinations." (*Id.* ¶ 79.) At

this time, Lucas' recent head injury prior to the onset of his psychosis was again

noted. (*Id.* ¶ 79.) Hillenbrand, reflecting the position of the St. Vincent providers,

indicated a "strong suspicion that these abrupt and intermittent symptoms had a

medical etiology." (*Id.*) A medical team then discussed the importance of a

neurological evaluation, (*id.* ¶ 80), but determined that he was "without psychosis

or mood symptoms,'" (*id.* ¶ 81).

On May 3, 2023, Lucas was reported to be making loud roaring noises,

spitting out his medications, kneeling on the floor, holding his breath, forcing

saliva out of his mouth, laughing uncontrollably, and punching a door and window.

(*Id.* ¶ 82.) As a result, Lucas was placed in seclusion, (*id.* ¶ 113), and was sedated

for his safety, (*id.* ¶ 82). Staff also had Lucas engage in the "outdated" and

"proven ineffective" practice of "[c]ontracting for safety." (*Id.* ¶ 115.) After these events, "there is no indication in the medical records that any of [Lucas'] providers at [Warm Springs] took extra precautions to ensure [he] was taking, and swallowing, his medications." (*Id.* ¶ 84.)

The next day, May 4, 2023, Lucas again did not remember the events of the day before. (*Id.* ¶ 85.) He was acting in a suspicious and hyper-religious manner, and refused to allow Warm Springs to contact his daughter. (*Id.*) These behaviors "should have been noted as an indicator of psychosis," but were not. (*Id.*) Hillenbrand noted "suspiciousness, hyper religious behaviors, catatonic/aggressive behavior after which [Lucas] had no recollection of the events." (*Id.* ¶ 116.) He was then given medication to alleviate his psychotic condition. (*Id.*) However, Hillenbrand discontinued Lucas' prescription for olanzapine, an antipsychotic medication,[6] because "patient [Lucas] refuses." (*Id.* ¶ 118.) Providers also did not give Lucas his prescribed Seroquel, another antipsychotic medication,[7] that day because it was not available at the Warm Springs pharmacy. (*Id.* ¶ 119.) On this day, Individual State Defendant O'Connell, conducted an "Initial Social Assessment" of Lucas. (*Id.* ¶ 86.) The Assessment contained inaccurate

---

[6] Jacob S. Ballon and T. Scott Stroup, *Psychosis*, in *Merritt's Neurology*, 1307–08 (David H. Strauss 13th ed. 2015).

[7] Olusola Ajilore and Mark M. Rasenick, *General Principles of Psychopharmacology*, in *Lippincott, Williams, & Wilkins Kaplan & Sadock's Comprehensive Textbook of Psychiatry* 2937, 2996 (10th ed. 2014).

information. (*Id.* ¶¶ 88–89.) It also required Lucas be "medication compliant" and "stable" prior to discharge. (*Id.* ¶¶ 93–96.)

On May 5, 2023, Lucas exhibited "much paranoid ideation" including "being chased by a liberal democratic crowd in Billings" and wanting "to get rid of his guns because of the Biden administration." (*Id.* ¶ 120.) That same day, Hillenbrand discontinued Lucas' prescription for Seroquel because "patient [Lucas] refuses." (*Id.* ¶ 122.) Later that night, Lucas was active in his sleep, pulling the baseboard off the wall, and in response, his roommate yelled at him. (*Id.* ¶ 121.) After Lucas spit in his roommate's face, the roommate punched Lucas in the head causing a "3 x 5 centimeter bump." (*Id.*)

On May 6, 2023, Lucas wrote the following

I think my meds are doing some good. Today I realized I had wronged 1 person and 1 organization with my 2 delusions. Or wronged myself. I had believed that a vacuum machine was a killing machine of some sort in Billings at the hospital.

(*Id.* ¶ 123.) On May 7, 2023, Lucas' Seroquel prescription was reissued. (*Id.* ¶ 124.) On May 8, 2023, Lucas reported back and hip pain, and dizziness as a result of his altercation with his roommate. (*Id.* ¶¶ 125, 141.) The need for a medical workup regarding his dizziness was noted but not completed. (*Id.*) Although Lucas had been hospitalized for ten days at this point, Hillenbrand only then provided a referral for psychological testing for diagnostic clarification. (*Id.* ¶¶ 126, 144.) She noted that Lucas' behavior seemed to worsen in the evening and

10

night hours, but "no nurse practitioner, psychologist, psychiatrist, or psychiatric nurse practitioner ever met with [Lucas] in the evening hours to assess him." (*Id.* ¶¶ 144–45.) Hillenbrand also noted that Lucas "showered independently," (*id.* ¶ 142), contradicting staff records documenting that Lucas was not bathing, (*id.* ¶ 143). Indeed, charting records show that Lucas only bathed a single time while at Warm Springs, on May 22, 2023. (*Id.* ¶¶ 143, 184.) "[R]outine hygiene is a marker of a patient's mental stability," (*id.* ¶ 143), and unwillingness to engage in hygienic practices is "a symptom of ongoing psychosis," (*id.* ¶¶ 182, 186; *see id.* ¶ 192). Lucas also only laundered his clothes once during his treatment period, (*id.* ¶ 188), and did not change his bed linens at all, (*id.* ¶ 193).

On May 11, 2023, Lucas' prescription for oxycodone was discontinued, (*id.* ¶ 117), even though oxycodone had been identified as contributing to Lucas' psychosis at his intake ten days earlier, (*id.* ¶ 50). Hillenbrand discussed Lucas' case with Dr. Damschen, resulting in potential diagnoses of "focal seizures, recent head trauma or vascular injury, late onset schizophrenia/delusional disorder, [and] frontal-temporal dementia." (*Id.* ¶ 149.) Dr. Damschen recognized Lucas' need for further testing but did not procure it. (*Id.* ¶ 150.) Lucas was in the observation area repeatedly turning the doorknob, picking the window, and displaying a "vacant expression and no social reciprocity." (*Id.* ¶ 147.) This behavior caused Warm Springs providers to again note the likelihood that Lucas' symptoms were

neurological in nature. (*Id.*) Nonetheless, Hillenbrand reclassified Lucas as Level Yellow the next day, (*id.* ¶ 148), and "a nurse for [Lucas'] primary care provider confirmed that [Lucas] had never been delusional at their clinic," (*id.* ¶ 152).

On May 15, 2023, Warm Springs providers noted that Lucas "had gone through the weekend with no odd behavior." (*Id.* ¶ 155.) Individual State Defendant Audrey Mattson, a psychologist, (*id.* ¶ 521), obtained Lucas' informed consent for a complete interview, (*id.* ¶ 156). Mattson's notes indicate that she spoke with Hillenbrand regarding Lucas' reluctance to and questions regarding referral for evaluations. (*Id.* ¶ 158.) However, Hillenbrand's notes do not reflect such a discussion. (*Id.*) Neither Mattson nor Hillenbrand's notes reflect that Lucas' unwillingness to engage in this process was a sign of psychosis. (*Id.*)

On May 16, 2023, Lucas "regressed," demonstrating "suspiciousness and illogical thought." (*Id.* ¶ 159.) He reported his medications were "making his eyes cross," which he stated he had "read about . . . in the DSM-5." (*Id.* ¶ 160.) However, his medication was not making his eyes cross. (*Id.*) Lucas suffered from age-related loss of ability to focus on objects up close, which is treated with reading glasses. (*Id.*) On this day, he also met with a therapist who was to provide individual therapy, however Lucas declined to engage. (*Id.* ¶ 161.) Such individualized therapy is necessary "to fully evaluate [a] patient's symptoms" and "refusal to engage in individual therapy is a sign of psychosis." (*Id.* ¶¶ 162–63.)

12

On May 17, 2023, Mattson again met with Lucas and he refused to proceed with a neurocognitive assessment. (*Id.* ¶¶ 127, 164.) Following his single refusal, such an assessment was "never revisited" and "Hillenbrand did not require it to advance [Lucas] through the [care] levels of" Warm Springs, "[n]or did she ever make it a condition of discharge." (*Id.* ¶ 128.) Further, the role of a neurological assessment in Lucas' treatment and discharge was either "never explained to" Lucas or "he was unable to understand its importance" given his psychosis. (*Id.* ¶¶ 166–67.) On this day, Lucas also submitted a request to meet with his treatment team. (*Id.* ¶ 170.) O'Connell's Progress Notes indicate that the team discussed Lucas' discharge plan at this meeting. (*Id.* ¶ 171.) These notes do not contain "what criteria must be met, or for how long, before discharge was viable." (*Id.*)

On May 18, 2023, Hillenbrand completed some of her discharge orders. (*Id.* ¶ 172.) On May 19, 2023, Lucas barricaded his door with a bed and accused staff of trying to "gas him." (*Id.* ¶ 173) He also spit out his medications. (*Id.* ¶¶ 97, 173.) Lucas admitted that his behavior was strange. (*Id.* ¶ 173.) Lucas' discharge plan was not reconsidered following these events. (*Id.* ¶ 175.)

Between May 19 and May 23, 2023, the Warm Springs records do not contain documentation of Lucas' condition. (*Id.* ¶ 176.) Indeed, there is no record of him attending groups or meeting with treatment team providers, and none of the records of his attending nurses contain any information regarding his mental status

13

during this time.  (*Id.*)  A single note dated May 20, 2023, which was completed by

Individual State Defendant Dorcas Parks, a recreational therapist, (*id.* ¶ 130),

indicates Lucas continued to attend groups until discharge, however it merely

states that Lucas attended eighteen groups between May 16, 2023 and May 20,

2023, (*id.* ¶¶ 177, 179).  There are neither "contemporaneous" records of the

specific groups attended nor observations of Lucas' demeanor.  (*Id.* ¶ 179.)

During the entirety of Lucas' time at Warm Springs, he never underwent

psychiatric or psychological testing, meaning that "no determination was made

regarding [the cause of Lucas'] psychiatric symptoms."  (*Id.* ¶ 468.)  He never

received a workup to determine if his symptoms were a result of a traumatic brain

injury despite St. Vincent providers noting Lucas' history of head injuries and his

recent fall that coincided with the onset of his symptoms.  (*Id.* ¶ 469.)  Also,

despite Warm Springs "nurse practitioners and medical doctors believing there was

a component to Lucas' psychosis that was not explained by Ambien and

oxycodone usage," none of his providers conducted a workup to determine

whether a neurocognitive disorder was causing Lucas' psychosis.  (*Id.* ¶ 470.)

### iii.  Group Treatment

The "vast majority" of Lucas' group treatment was overseen by recreational

therapist Parks.  (*Id.* ¶¶ 129–30.)  Upon information and belief, Parks did not have

the training or qualifications necessary to evaluate symptoms of psychosis.  (*Id.*

¶ 133.) Her May 6, May 13, and May 20, 2023 "Weekly Mental Health Service Notes" are "identical" except for the number of groups attended. (*Id.* ¶ 131.) These Notes were not recorded contemporaneously with each group and do not detail the specific activities Lucas engaged in during group sessions. (*Id.*) Parks' failure to observe and document specific symptoms of psychosis resulted in an "inaccurate picture of [Lucas'] progress while at" Warm Springs. (*Id.* ¶ 134.)

### iv. Fifteen-Minute Checks

As discussed above, Lucas' Treatment Plan required fifteen-minute checks, (*id.* ¶ 55), which consist of staff noting a patient's location, activities, status as asleep or awake, mood, rule compliance, food consumption, and hygiene, (*id.* ¶¶ 66, 201). These checks are crucial to treatment because they allow "providers who only meet with [a] patient intermittently have an accurate picture of the patients' condition and progress." (*Id.* ¶ 200.) Thus, accurate observation and documentation during these checks is necessary for treatment. (*Id.*)

Lucas identifies three days of fifteen-minute checks as "problematic": those that occurred on May 9, 10, and 11, 2023. (*Id.* ¶ 316.) A recounting of the fifteen-minute checks conducted by individual staff members during hour and a half

15

periods is provided for May 9, 2023[8] and for May 10, 2023.[9]  There are no records of fifteen-minute checks from 1:00 p.m. to 11:45 p.m. on May 10, 2023, (*id.* ¶ 318), or on May 11, 2023 at any time, (*id.* ¶ 319).

Each individual Warm Springs staff member that conducted these checks either did not receive adequate training regarding their duties to document Lucas' activity, physical condition, and mental status, or did receive adequate training and failed to perform their duties.  (*Id.* ¶¶ 205, 211, 218, 227, 236, 243, 250, 257, 264, 271, 278, 285, 293, 300, 306, 313; *see id.* ¶¶ 320–21.)  Such failures resulted in unreliable medical records, (*id.* ¶¶ 206, 212, 219, 228, 237, 244, 251, 258, 265, 272, 279, 286, 294, 301, 307, 314), which, in turn, resulted in an inaccurate assessment of Lucas' mental state contributing to his premature discharge from Warm Springs, (*id.* ¶¶ 207, 213, 220, 229, 238, 245, 252, 259, 266, 273, 280, 287, 295, 302, 308, 315, 327–28).  Lucas' food consumption, (*id.* ¶¶ 320, 322–24), and ability to rest and sleep, (*id.* ¶¶ 325–26), were either incorrectly documented during these checks or clearly indicated that he was suffering from psychosis.

### v.  Monitoring by Nursing Staff

---

[8] (Doc. 41 ¶¶ 202–03 (Cheri Blackstone); *id.* ¶ 208 (TS); *id.* ¶¶ 214–15 (Mary Herndon); *id.* ¶¶ 221, 224 (Lannette Allen); *id.* ¶¶ 230, 233 (Chastity Hunt); *id.* ¶¶ 239, 241 (Rain Ingrahm); *id.* ¶¶ 246–47 (Kekke Young); *id.* ¶¶ 252–54 (Bernice Williams); *id.* ¶¶ 260–61 (Sara Burton); *id.* ¶¶ 267–68 (Ladrika Williams); *id.* ¶¶ 274–75 (J. Aaron Dixon); *id.* ¶¶ 281–82 (Destiny Edwards).)

[9]  (Doc. 41 ¶¶ 288–89 (Sara Haver or Shana Harrington); *id.* ¶¶ 296–97 (Jennifer Harris); *id.* ¶ 303 (VB); *id.* ¶¶ 309–10 (Nona Ferguson).)

As discussed above, Lucas' Treatment Plan required nursing staff to monitor Lucas' mental status, including anxiety, memory loss, confusion, depression, restlessness, lethargy, or stupor. (*Id.* ¶¶ 104, 331.) A recounting of the individual registered nurses that conducted this monitoring is provided for the following days in 2023: April 28[10] and 29,[11] May 1,[12] 2,[13] 3,[14] 4,[15] 5,[16] 6,[17] 7,[18] 8,[19] 9,[20] 10,[21] 12,[22] 13,[23] 14,[24] 15,[25] 17,[26] 18,[27] 19,[28] 20,[29] 22,[30] 23,[31] and 24.[32] Each nurse is identified

---

[10] (*Id.* ¶¶ 382–83 (Kim Collins).)

[11] (*Id.* ¶¶ 358–59 (Marietta Muckerman); *id.* ¶¶ 414–15 (Zhanna Crystal).)

[12] (*Id.* ¶¶ 390–91 (Megan Forrester); *id.* ¶¶ 430–31(Phillip Eaton).)

[13] (*Id.* ¶¶ 382–83 (Kim Collins); *id.* ¶¶ 398–99 (Stacy Van Hook n/k/a Stacy Van Hook Smith).)

[14] (*Id.* ¶¶ 342–43 (Sherri Eaves); *id.* ¶¶ 414–15 (Zhanna Crystal).)

[15] (*Id.* ¶¶ 358–59 (Marietta Muckerman); *id.* ¶¶ 406–07 (Polleen Hansen); (*id.* ¶¶ 422–23 (Michelle Goetlich)).)

[16] (*Id.* ¶¶ 406–07 (Polleen Hansen); *id.* ¶¶ 414–15 (Zhanna Crystal).)

[17] (*Id.* ¶¶ 342–43 (Sherri Eaves).)

[18] (*Id.* ¶¶ 382–83 (Kim Collins); *id.* ¶¶ 438–39 (Jessica Pearson).)

[19] (*Id.* ¶¶ 390–91 (Megan Forrester).)

[20] (*Id.* ¶¶ 334–35 (Bethann Ruark); *id.* ¶¶ 438–39 (Jessica Pearson).)

[21] (*Id.* ¶¶ 438–39 (Jessica Pearson).)

[22] (*Id.* ¶¶ 342–43 (Sherri Eaves); *id.* ¶¶ 382–83 (Kim Collins); *id.* ¶¶ 414–15 (Zhanna Crystal).)

[23] (*Id.* ¶¶ 358–59 (Marietta Muckerman).)

[24] (*Id.* ¶¶ 334–35 (Bethann Ruark).)

[25] (*Id.* ¶¶ 334–35 (Bethann Ruark).)

[26] (*Id.* ¶¶ 342–43 (Sherri Eaves).)

[27] (*Id.* ¶¶ 350–51 (Shanna Harrington); *id.* ¶¶ 358–59 (Marietta Muckerman); *id.* ¶¶ 366–67 (Joy Ariyo n/k/a Joy Ariyo Montunrayo).)

[28] (*Id.* ¶¶ 374–75 (Daneila Lucero).)

[29] (*Id.* ¶¶ 382–83 (Kim Collins).)

[30] (*Id.* ¶¶ 334–35 (Bethann Ruark).)

[31] (*Id.* ¶¶ 430–31(Phillip Eaton).)

[32] (*Id.* ¶¶ 334–35 (Bethann Ruark).)

by initials and Lucas has set forth who he believes these individuals to be. Kathleen Jemmett was also assigned to Lucas' unit; however, the dates of her assignment are illegible. (*Id.* ¶ 446.)

Each individual Warm Springs registered nurse that conducted this monitoring either did not receive adequate training regarding their duties to document Lucas' mental status or did receive adequate training and failed to perform their duties. (*Id.* ¶¶ 338–39, 346–47, 354–55, 362–63, 370–71, 378–79, 386–87, 394–95, 402–03, 410–11, 418–19, 426–27, 434–35, 442–43.) Such failures resulted in unreliable medical records, (*id.* ¶¶ 340, 348, 356, 364, 372, 380, 388, 396, 404, 412, 420, 428, 436, 444), which, in turn, resulted in an inaccurate assessment of Lucas' mental state contributing to his premature discharge from Warm Springs, (*id.* ¶¶ 341, 349, 357, 365, 373, 381, 389, 397, 405, 413, 421, 429, 437, 445). Lucas believes that none of the nurses were disciplined for his inadequate treatment. (*Id.* ¶ 452.) Consistently, Farris, in his supervisory role, failed to ensure Lucas was adequately monitored, (*id.* ¶¶ 447–49), which resulted in his failure to "fulfill his obligation to ensure [Lucas] received mental health treatment that would give [him] a realistic opportunity to be cured," (*id.* ¶ 449).

### vi. Contact with Bouchard

On May 8, 2023, Lucas gave Warm Springs staff permission to speak with his daughter, Bouchard. (*Id.* ¶ 136.) However, Bouchard was not consulted

18

regarding Lucas' behaviors or the discharge plan, and many of her questions were not responded to by O'Connell or Hillenbrand. (*Id.* ¶¶ 137, 139–40) For example, Bouchard's May 9, 2023 inquiry regarding privately paying for additional testing to ensure Lucas obtained necessary care went unanswered. (*Id.* ¶ 146.)

On May 14, 2023, Bouchard advised Hillenbrand that she "was in over her head in term of providing care for" Lucas. (*Id.* ¶ 153.) Bouchard explained that "she could stay overnight with [Lucas] for a few days, but she needed to work and she provided care for a young child, so she could not be with him twenty-four hours per day." (*Id.*) Bouchard conveyed that "she would support a lower-level care facility if [Lucas] needed twenty-four-hour care." (*Id.*) Montana State Hospital group homes, which provide twenty-four-hour care and can function to "transition" patients from inpatient care to "full discharge home," were "never considered" for Lucas. (*Id.* ¶ 154.)

On May 15, 2023, Warm Springs providers noted that Bouchard indicated Lucas seemed "'back to his normal self.'" (*Id.* ¶ 155.) Bouchard denies making this observation. (*Id.*) Instead, Bouchard asserts that "she conveyed [Lucas] was making progress and seemed better," (*id.*), but he did not seem "stable," (*id.* ¶ 453), and, because "she did not see him regularly[,] . . . providers with twenty-four-hour contact would be in a better position to determine his status," (*id.* ¶ 155).

Bouchard also told Warm Springs staff that "she was not qualified to be responsible for his care if he was not stable." (*Id.* ¶ 453.)

### vii.  Discharge

On May 19, 2023, Lucas submitted an "A-Wing Treatment Team Request Form" requesting a "green badge." (*Id.* ¶ 61.) Hillenbrand noted on the form that the request would be addressed a few days later, (*id.* ¶ 62), and on May 23, 2023, instead of being reclassified as Level Green, Lucas was discharged, (*id.* ¶ 63). There is no Level Green application for Lucas in the Warm Springs records. (*Id.* ¶ 64.) Because Lucas was never reclassified from Level Yellow to Level Green, his discharge was in violation of Warm Springs policies. (*Id.* ¶ 65.)

Upon discharge, it was noted that Lucas' "psychosis likely had a neurological cause," partly evidenced by the positive effect of gabapentin on his psychotic symptoms. (*Id.* ¶ 454.) The discharge summary stated that Lucas "never reported visual hallucinations," despite Lucas having described at least three hallucinations involving talking to people that were not there, throwing guns out a window during a chase, and seeing aliens with swords. (*Id.* ¶ 455.)

No one at Warm Springs informed Bouchard that Lucas needed twenty-four-hour care upon discharge. (*Id.* ¶ 462.) Indeed, all formal communications from Warm Springs indicated that Lucas was stable. (*Id.* ¶¶ 458, 461; *see id.* ¶ 464.) In her discharge summary, Hillenbrand noted that Lucas was "was calm, cooperative,

had good eye contact and was pleasant. There was no suspiciousness, no evidence of delusions or hallucinations." (*Id.* ¶ 459.) On May 24, 2023, "discharge instructions" were provided by Warm Springs. (*Id.* ¶ 458.) O'Connell completed these instructions, noting the medications Lucas should take but omitting any reference to twenty-four-hour care. (*Id.*) Both Hillenbrand's discharge evaluation and O'Connell's discharge instructions led Bouchard to believe Lucas was stable. (*Id.* ¶¶ 458, 461.) If Bouchard had been informed that Lucas needed twenty-four-hour care, "she would not have agreed to take him home." (*Id.* ¶ 464.) Even so, Bouchard advocated for delaying Lucas' discharge. (*Id.* ¶ 481.) As discussed above, she proposed Lucas be transferred to a lower-level-care facility, (*id.* ¶¶ 153, 481), but an alternative to discharge was not considered by Lucas' providers at Warm Springs, (*id.* ¶¶ 482–83).

At the time of discharge, neither Bouchard nor Lucas' brother, Brian Lucas, were informed that Lucas was not stable, (*id.* ¶ 473); was still suffering from paranoia, suspiciousness, and delusional thought, (*id.* ¶¶ 474, 479); was recently "cheeking his meds and spitting them out," (*id.* ¶ 476); required medical supervision to ensure he was not a threat to his own safety, (*id.* ¶ 477); and required supervision to ensure he took his medication, (*id.* ¶ 478). Bouchard and Brian Lucas were not aware that Lucas would not be safe if left alone. (*Id.* ¶ 475.)

21

"If Plaintiff needed twenty-four-hour care in order to protect him from self-harm or harm to others, he should not have been discharged." (*Id.* ¶ 457.)

### d. Post-Discharge

Following his discharge, Bouchard took Lucas back to his home in Huntley, Montana. (*Id.* ¶ 495.) The next morning, consistent with her comments to Warm Springs staff, Bouchard left for work. (*Id.* ¶ 496.) That afternoon, Bouchard received a phone call from Lucas telling her not to come to his house and to call the Sheriff and an ambulance. (*Id.* ¶ 497.) Bouchard found Lucas in a shed, confused and bloody. (*Id.*) He had put a pitchfork through his neck because he was hallucinating that "he had a demon and was trying to get it out." (*Id.*) Lucas obliterated his throat, soft palate, and uvula. (*Id.*) His wound was so deep that his vertebrae were showing. (*Id.*) After realizing what he had done, Lucas was embarrassed and ashamed, and as a result, tried to commit suicide. (*Id.* ¶ 500.)

## II. Procedural Background

On February 26, 2025, Lucas brought this case against fifteen defendants. (Docs. 1.) On March 28, 2025, he amended his complaint, adding an additional thirty-three defendants. (Doc. 3.) As mentioned above, following dismissal of his Amended Complaint for failure to state a colorable or plausible due process claim and insufficient pleading under Rule 8 of the Federal Rules of Civil Procedure, Lucas was given leave to amend. (Doc. 34.) On October 17, 2025, he filed his Second Amended Complaint. (Doc. 41.) For his federal claims, Lucas alleges

22

violations of his Fourteenth Amendment due process rights under 42 U.S.C. § 1983 against Hillenbrand, DePasquale, O'Connell, Dr. Damschen, Parks, Tarvin, and Farris (Count III)[33] and against Corporate Defendants through *Monell* liability[34] (Count IV), a claim for attorney fees against Corporate Defendants, Hillenbrand, DePasquale, O'Connell, Dr. Damschen, Parks, Tarvin, and Farris under 42 U.S.C. § 1988 (Count V), and an "inapplicability of damage caps" claim against Hillenbrand, DePasquale, O'Connell, Dr. Damschen, Parks, Tarvin, Farris, and Corporate Defendants (Count VIII).[35] For his state law claims, Lucas alleges medical negligence against Montana, Corporate Defendants, Hillenbrand, DePasquale, Dr. Damschen, Mattson, Farris, and Fenchak (Count I), loss of chance against Corporate Defendants and Hillenbrand, DePasquale, Dr. Damschen, Mattson, Farris, and Fenchak[36] (Count II), negligence against Corporate Defendants (Count VI), and an "unconstitutional damage cap" claim against all defendants (Count VII).

On December 15, 2025, Corporate Defendants filed a partial motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 47.) That same day, State Defendants also filed a motion

---

[33] Fenchak is not named in the heading but is referred to in the paragraphs below.
[34] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978 ).
[35] This Count is incorrectly labeled "Count VII." (*See* Doc. 41 at ¶¶ 723–28.)
[36] Fenchak is referred to as both "Fenchak" and "Fenchack." (*Compare* Doc. 41 at ¶ 7 *with id.* ¶ 509.) "Fenchak" is correct. (Doc. 50 at 6.)

to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) and failure to state a claim pursuant to Rule 12(b)(6). (Doc. 49.)

**LEGAL STANDARD**

## I.    Rule 12(b)(1)

A challenge to the jurisdiction of a federal court is properly brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure. "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Rattlesnake Coalition v. U.S. Env't Prot. Agency*, 509 F.3d 1095, 1102 n.1 (9th Cir. 2007). "[F]ederal jurisdiction [under 28 U.S.C. § 1331] exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 391 (1987). "A plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006) (citing *Bell v. Hood*, 327 U.S. 678, 681–85 (1946)).

Dismissal is appropriate where the federal question is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy[.]" *Oneida Indian Nation of New York v. County of Oneida*, 414 U.S. 661, 666 (1974). "[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh*, 546 U.S. at 514. "In contrast, when a court

24

grants a motion to dismiss for failure to state a federal claim, the court generally retains jurisdiction to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over pendent state-law claims." *Id.* A pleading may survive a 12(b)(1) challenge but fail to state a claim pursuant to Rule 12(b)(6), which tests the legal sufficiency of a complaint. *See Boettcher v. Sec'y of Health & Human Servs.*, 759 F.2d 719, 722 (9th Cir. 1985) ("A determination that [a claim] lacks merit does not necessarily mean . . . that it is so insubstantial and immaterial that it does not pass the 'colorable' test.").

## II.   Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal is appropriate "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (internal quotation marks omitted).

### ANALYSIS

25

Lucas' Second Amended Complaint again fails to state a claim under the Due Process Clause. While a single due process claim against four Individual State Defendants survives under the Rule 12(b)(1) standard, it fails on the merits under Rule 12(b)(6). Because Lucas fails to plead an underlying constitutional violation, his *Monell* claims against Corporate Defendants also fail. The exercise of supplemental jurisdiction over his remaining state law claims is declined and he is not given leave to amend.

## I.   Subject Matter Jurisdiction (Rule 12(b)(1))

State Defendants argue that Lucas' claims should be dismissed for want of subject matter jurisdiction pursuant to Rule 12(b)(1) because Lucas fails to allege a colorable federal right. Specifically, they argue that Lucas' § 1983 claims against them fail because the Fourth Amendment Due Process Clause does not include a right to adequate mental health treatment before discharge, outside the context of indeterminate commitments. In response, Lucas briefly argues that his commitment to Warm Springs was indeterminate, and asserts that two exceptions to the general rule against failure-to-act liability for § 1983 claims apply here: the state-created-danger exception and the special-relationship exception. Ultimately, Lucas only alleges a colorable claim under the special-relationship exception.

### a.  Lucas' Federal Claims

Lucas' federal claims against State Defendants are alleged violations of his Fourteenth Amendment due process rights under 42 U.S.C. § 1983. (Doc. 41 at ¶¶ 544–75 (Count III).[37]) Specifically, he alleges that his due process rights were violated when the following Individual State Defendants took specific action or inaction regarding his treatment: Hillenbrand, (*id.* ¶ 555), DePasquale, (*id.* ¶ 556), Dr. Damschen, (*id.* ¶ 557), Mattson, (*id.* ¶ 558), O'Connell, (*id.* ¶ 559), Farris, (*id.* ¶ 560), Parks, (*id.* ¶ 561), and Tarvin, (*id.* ¶ 562), which led to the premature decision to discharge him, (*id.* ¶¶ 565–67), and resulted in his hallucination-induced self-harm, (*id.* ¶¶ 568–70); and when Individual State Defendants Hillenbrand, O'Connell, Farris, and Tarvin "failed to protect [Lucas] from an altercation with his roommate," which resulted in "physical injury," (*id.* ¶ 554).

### b. Legal Standard

"Section 1983 provides a tort remedy for persons whose constitutional rights have been violated by state officials acting 'under color of' law." *Whalen v. McMullen*, 907 F.3d 1139, 1145 (9th Cir. 2018) (quoting 42 U.S.C. § 1983). "To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of

---

[37] Lucas also seeks attorney fees under § 1988. (Doc. 41 at ¶¶ 626–29.)

State law." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (internal quotation marks omitted).

### c. Scope of the Right

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." Consistently, an individual that has been involuntarily committed has a substantive due process right to "adequate food, shelter, clothing, and medical care," as well as "conditions of reasonable care and safety." *Youngberg v. Romeo*, 457 U.S. 307, 315–24 (1982). Nonetheless, the Due Process "Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). While "[i]t forbids the State itself [from] depriv[ing] individuals of life, liberty or property without 'due process of law,' . . . its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.*

As a result, "the Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 195, 201. However, in the context of indeterminate commitments, "the Fourteenth Amendment Due Process Clause requires states to

28

provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured and released." *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000). There are also "two exceptions to the general rule against failure-to-act liability for § 1983 claims[,]" the "state-created danger exception" and the "special-relationship exception." *Murguia v. Langdon*, 61 F.4th 1096, 1108 (9th Cir. 2023) (collecting cases). The state-created danger exception applies when "there is affirmative conduct on the part of the state in placing the plaintiff in danger[, and] . . . where the state acts with deliberate indifference to a known or obvious danger." *Id.* at 1111 (internal citation and quotation marks omitted). "The special-relationship exception applies when [the] state takes a person into its custody and holds him there against his will." *Id.* at 1109 (alteration in original) (internal quotation marks omitted).

## 1. Indeterminate Commitment

In its October 24, 2025 Order dismissing Lucas' prior pleading, the Court explained that while the Ninth Circuit has recognized a duty to provide adequate treatment for mental health conditions before discharge, "it has only done so in the context of indeterminate commitments." (Doc. 34 at 11 (citing *Ohlinger v. Watson,* 652 F.2d 775, 778 (9th Cir. 1980); *Sharp,* 233 F.3d at 1172).) "[B]ecause Lucas was discharged, which is the opposite of being held indefinitely, the due process analysis contained in *Ohlinger* and *Sharp* provides no basis of relief here."

(*Id.* at 12.) "[T]o preserve the issue for appeal," Lucas now argues that he "was entitled to the right to adequate mental health treatment while committed at [Warm Springs] because an involuntary civil commitment in Montana is, practically speaking, indeterminate, as a court can grant indefinite extensions if it continues to find that the patient meets the criteria for an involuntary commitment." (Doc. 53 at 13, 25.) Thus, Lucas does not contest that the right he seeks to establish is limited to indeterminate commitments, but instead argues that his commitment was the functional equivalent of an indeterminate commitment. Not so.

Under Montana law, a commitment order is required to expire within three months. Mont. Code Ann. § 53-21-127. That period of commitment may be extended if "the professional person in charge of the patient at the place of commitment . . . petition[s] the district court . . . for extension of the commitment period." Mont. Code Ann. § 53-21-128(1)(a). Such a "petition must be accompanied by a written report and evaluation of the patient's mental and physical condition. The report must describe any tests and evaluation devices that have been employed in evaluating the patient, the course of treatment that was undertaken for the patient, and the future course of treatment anticipated by the professional person." *Id.* The court provides written notice of the filed petition to, *inter alia*, the patient, the patient's next of kin, and the patient's counsel. Mont. Code Ann. § 53-21-128(1)(b). Any of these individuals may request "a hearing

prior to the termination of the previous commitment authority," which will be set by the court "immediately." *Id.* If a hearing occurs, the court must dismiss the petition if it "finds the patient not to be suffering from a mental disorder." Mont. Code Ann. § 53-21-128(1)(d). "If the court finds that the patient continues to suffer from a mental disorder and to require commitment, the court shall order commitment [that does] not affect the patient's custody for more than 6 months." *Id.* This commitment order must "describe what alternatives for treatment of the patient are available, what alternatives were investigated, and why the investigated alternatives were not found suitable." *Id.* Further extensions may be obtained, "[h]owever, the patient's custody may not be affected for more than 1 year without a renewal of the commitment under the procedures" detailed above. Mont. Code Ann. § 53-21-128(3).

The record does not show that Lucas' involuntary commitment to Warm Springs for less than one month is the functional equivalent of an indeterminate commitment. In both *Ohlinger* and *Sharp*, facially indeterminate life sentences were ordered. 652 F.2d at 776; 233 F.3d at 1172. Lucas, on the other hand, was involuntarily committed to Warm Springs for not more than three months pursuant to Mont. Code Ann. § 53-21-127. (Doc. 41 at ¶¶ 39, 42.) In his pleadings, Lucas acknowledges that his involuntary commitment order expired on July 28, 2023, (Doc. 41 at ¶ 43), and there is no mention of an extension being sought, (*see*

31

*generally id.*).  While Lucas' commitment could have been extended subject to the statutory requirements above, it was not.  Such a possibility is purely speculative.

Nevertheless, Lucas insists that the "only difference between the civil commitment structure in Montana and *Sharp* is that civil commitments in Montana can be continued upon proof that continued custody is needed, whereas the commitments in *Sharp* could only be terminated upon proof that continued custody is not needed.  Practically, though, a patient can be civilly committed to the same amount of time under both structures, yet only be entitled to a right to adequate mental health treatment under the latter." (Doc. 53 at 30.)  However, requiring evidence and a judicial order to keep an individual committed is fundamentally different than requiring those same conditions for release.  *Ohlinger* made clear that a civilly committed person's due process right to mental health treatment that gives "them a realistic opportunity to be cured" is "constitutionally required because, absent treatment, [such person] could be held indefinitely."  652 F.2d at 778.  *Sharp* uses the standard articulated in *Ohlinger* and further explains that it serves the purpose of ensuring that a "promise of treatment" is not a mere "illusion of benevolence to what is essentially a warehousing operation for social misfits." 233 F.3d at 1172 (internal quotation marks omitted).  Such a risk of warehousing exists where, as in *Sharp,* a commitment can only be terminated with sufficient proof.  Montana's system of civil commitments, on the other hand, specifically

32

guards against such warehousing through its rigorous requirements for extension, which include a "written report" that describes a patient's current and future course of treatment, the opportunity for a hearing, a judicial order that addresses the patient's treatment, and a cap on the duration of commitment without renewal of these procedures. Mont. Code Ann. § 53-21-128(1)(b), 1(d), (3).

Accordingly, Lucas' commitment is not functionally equivalent to a lifetime commitment. Because the constitutional duty to provide adequate mental treatment before discharge has only been recognized in the context of indeterminate commitments, Lucas cannot allege a colorable due process claim under this theory.

### 2. Exceptions

Lucas argues that the state-created-danger exception applies to the decision to discharge him prematurely and that the special-relationship exception applies to the decision to place him with a roommate. Only his second argument is persuasive.

### a. State-Created-Danger Exception

To plead a due process claim under the state-created-danger exception, a plaintiff must allege that: (1) the state actors' "affirmative act . . . create[d] an actual, particularized danger," (2) "the ultimate injury to the plaintiff[ was] foreseeable," and (3) the state actors "acted with deliberate indifference to a known

33

or obvious danger." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018) (citations and internal quotation marks omitted). Here, Lucas argues that "State Defendants affirmatively acted to create a foreseeable risk of self-harm by ending Lucas' involuntary custody before his commitment expired despite facts indicating he was actively suffering from psychosis and incapable of functioning without continuous, professional supervision." (Doc. 53 at 13–14.) He insists that in doing so, State Defendants acted with deliberate indifference. Thus, Lucas asserts that liability exists under the state-created danger exception.

State Defendants, on the other hand, argue that the pleadings are devoid of "well-pleaded factual allegations . . . suggesting any Individual State Employee engaged in affirmative conduct that exposed [Lucas] to an actual, particularized danger he would not have otherwise faced, much less . . . [having] d[one] so with deliberate indifference." (Doc. 50 at 13.) They assert that "at the most fundamental level, the [Second Amended Complaint] does not even allege Lucas was discharged from [Warm Springs] in a worse condition than when he entered," instead pleading that upon discharge, Lucas' "'behaviors were *improved* but not stable.'" (*Id.* at 13–14 (citing Doc. 41 (Second Amended Complaint) at ¶ 453.) Ultimately, State Defendants are correct.

As a preliminary matter, the state-created-danger doctrine specifically "provides an exception to the general rule that the Fourteenth Amendment does not

impose a duty on the State to protect individuals from third parties," meaning "by its very nature, the doctrine only applies in situations where the plaintiff was directly harmed *by a third party.*" *Henry A. v. Wilden*, 678 F.3d 991, 1002 (9th Cir. 2012). Here, there is no third party involved; Lucas harmed himself. Yet courts have construed the "third party" requirement to include harms beyond those caused by a third individual. For example, in *Penilla v. City of Huntington Park*, the danger at issue was illness, 115 F.3d 707, 708, 710 (9th Cir. 1997) (per curiam), and in *Munger v. City of Glasgow Police Department*, the danger was the cold, 227 F.3d 1082, 1087 (9th Cir. 2000) (explaining "external dangers [can] include[e] the possibility of harm from a third person," but finding "subfreezing" "outside temperatures" to be the "danger").

Nevertheless, to plead a due process claim under this exception, Lucas must show that the Individual State Defendants "placed [him] in a worse position than he would have been in had [the state] not acted at all." *Polanco v. Diaz*, 76 F.4th 918, 926 (9th Cir. 2023) (second alteration in original); *see Martinez v. City of Clovis*, 943 F.3d 1260, 1272 (9th Cir. 2019); *Patel v. Kent Sch. Distr.* 648 F.3d 965, 975 (9th Cir. 2011). The crux of Lucas' argument is that State Defendants' affirmative decision to prematurely discharge Lucas without appropriate supervision left him in a foreseeable situation that was more dangerous than if he remained in state custody "until at least the civil commitment order expired."

35

(Doc. 53 at 16.) However, when determining whether a plaintiff was left in a worse position, courts consider an alternative reality where the state had "not acted at all," not an alternative reality of additional state action. *DeShaney*, 489 U.S. at 201 ("[T]he State . . . placed him in no worse position than that in which he would have been had it not acted at all[.]"); *accord Johnson v. City of Seattle*, 474 F.3d 634, 641 (9th Cir. 2007); *Hernandez*, 897 F.3d at 1135; *Polanco*, 76 F.4th at 926. Consistently, to allege a violation of the Due Process Clause under this exception, Lucas must allege that he was left in a worse position than if the state had not acted *at all*. He does not do so.

State intervention began on April 28, 2023, when the Yellowstone County Attorney's Office petitioned to have Lucas involuntarily committed, which resulted in his transportation to Warm Springs. (Doc. 41 at ¶¶ 39, 41, 44.) Before his commitment, Lucas was suffering from "visual hallucinations" and "extreme paranoia," and was "making suicidal threats." (*Id.* ¶¶ 15–16.) During his involuntary hold at St. Vincent, his hallucinations, paranoid behavior, and suicidal ideations persisted. (*Id.* ¶¶ 25, 27.) His treatment at Warm Springs improved Lucas' condition. (*Id.* ¶ 484.) Indeed, "[a]t the time of his discharge, [Lucas'] behaviors were improved but not stable." (*Id.* ¶ 484.)

Although Lucas is correct that his improved state does not necessarily vitiate liability under the state-created-danger exception, it does here. Because Lucas was

36

suffering from hallucinations, paranoid behavior, and suicidal ideations before the state intervened, and his condition improved at Warm Springs, Lucas was placed "in no worse position than that in which he would have been had [the state] not acted at all," *DeShaney*, 489 U.S. at 201, *i.e.*, had the state not taken custody of Lucas on April 28, 2023, *see Barany v. Cnty. of Contra Costa*, 2026 WL 296347, at *8 (9th Cir. Feb. 4, 2026) (rejecting the plaintiff's invocation of the state-created danger exception because "[u]pon her discharge, [plaintiff] was placed in the same circumstances . . . that she was in before the county took temporary custody" and the state intervention "did nothing to worsen" the situation).

Nevertheless, Lucas insists that State Defendants "created" a "foreseeable risk of serious self-harm" in their "decision to release [him] from involuntary custody while he remained incapacitated and unable to protect himself into an unsupervised, uncontrolled setting." (Doc. 53 at 17.) Viewing the facts in a light most favorable to Lucas, *Ariix, LLC*, 985 F.3d at 1114, the amended pleading shows that the decision to discharge Lucas was based on State Defendants' actions, which resulted in an inaccurate assessment of his mental state, (*e.g.*, Doc. 41 at ¶¶ 142–43), and that despite Bouchard informing staff that she could not provide twenty-four care, (*id.* ¶¶ 153, 456), State Defendants failed to notify him or Bouchard that he would require such care upon release, (*id.* ¶¶ 456, 458, 462). However, upon release, Lucas was placed in no worse position than that in which

37

he would have been had the state not acted at all. Accordingly, Lucas fails to allege a colorable claim under the state-created-danger exception.

### b. Special-Relationship Exception

The special-relationship "exception applies when a state 'takes a person into its custody and holds him there against his will.'" *Patel*, 648 F.3d at 972 (quoting *DeShaney*, 489 U.S. at 198–202). "'[C]ustody' for the purposes of the special-relationship exception is a restriction on the plaintiff's liberty that limits the ability of the plaintiff . . . to meet the plaintiff's basic needs (e.g., incarceration, institutionalization, foster care)." *Murguia*, 61 F.4th at 1110. The rationale is straight-forward: "[A] state cannot restrain a person's liberty without also assuming some responsibility for the person's safety and well-being." *Id.* at 1109.

Lucas argues that because State Defendants placed him with a roommate who subsequently assaulted him, State Defendants are liable under the special relationship exception. State Defendants do not address this argument in the context of jurisdiction, instead insisting that Lucas failed to state a claim to this effect. However, because State Defendants seek dismissal of all § 1983 claims against them for lack of jurisdiction, the question is whether Lucas alleges a colorable due process claim under the special relationship exception. He has. Because Lucas was involuntarily committed to Warm Springs, the special relationship exception is triggered. *Patel*, 648 F.3d at 972. Thus, the federal

38

question presented on the face of the Second Amended Complaint is not "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit" to warrant dismissal pursuant to Rule 12(b)(1). *Oneida Indian Nation of N.Y.*, 414 U.S. at 666.

### c. Conclusion

The only federal claim that survives this threshold jurisdictional review is Lucas' due process claim against Individual State Defendants Hillenbrand, O'Connell, Farris, and Tarvin for Lucas' roommate assignment. All other § 1983 claims against State Defendants are dismissed for want of jurisdiction.

## II. Failure to State a Claim (Rule 12(b)(6))

State Defendants argue that Lucas' limited remaining federal claim against them fails on the merits because he does not "identity any acts or omissions of particular employees that might qualify as constitutional violations or might have plausibly caused his damages." (Doc. 50 at 15.) State Defendants are correct. Corporate Defendants argue that Lucas' *Monell* claims should likewise be dismissed for failure to state a claim because he has not plausibly alleged a constitutional violation. Given the failure of these *Monell* claims, Corporate Defendants assert that Lucas' attendant claims for attorney fees and punitive damages must be dismissed as well. Corporate Defendants are also correct.

### a. § 1983 Claim against Individual State Defendants

39

Lucas' only remaining § 1983 claim is against Individual State Defendants Hillenbrand, O'Connell, Farris, and Tarvin for his roommate assignment. (Doc. 41 at ¶ 554; *see also* Doc. 53 at 25.) Specifically, this claim alleges the following:

> On May 5, 2023, employees with Montana State Hospital failed to protect [Lucas] from an altercation with his roommate. [Lucas] had had [sic] been deemed to be a safety threat to himself and others as a result of his hallucinations, delusions and paranoia. Yet those on [Lucas'] treatment team, Carly Hillenbrand, Kara O'Connell, Gabriel Farris, and Sara Tarvin failed to recognize the risk of injury to [Lucas] from placing him with a roommate. As a result, [Lucas] suffered physical injury.

(Doc. 41 at ¶ 554.) Under the special-relationship exception, "(1) [involuntarily committed] patients have a constitutional right to be safe in the state institution to which they are committed, and that (2) in the face of known threats to patient safety, state officials may not act (or fail to act) with conscious indifference, but must take adequate steps in accordance with professional standards to prevent harm from occurring." *Ammons v. State Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1030 (9th Cir. 2011) (internal quotation marks omitted).

The factual allegations relevant to this claim are as follows:

> On May 5, 2023, [Lucas] was assaulted by his roommate. [Warm Springs] staff believed [Lucas] had been active in his sleep, pulling baseboard off the wall near his roommate's bed. The roommate yelled at him. [Lucas] spit in his face. The roommate punched him in the head. The punch was severe enough to cause a 3 x 5 centimeter bump on the left back side of [Lucas'] head. He also had redness on the left lower quadrant of his back where he was hit.

40

(Doc. 41 at ¶ 121.)

> On May 8, 2023, [Lucas] reported back and hip pain. He also reported dizziness after being punched in the head by his roommate. It was noted that there needed to be a medial workup for his dizziness issues, but no medical work up took place.

(*Id.* ¶ 125.)

> On May 8, 2023, [Lucas] reported pain after being assaulted by his roommate. He reported his back and left leg were hurting and walking was difficult. It was noted his complaints of dizziness should be evaluated by a medical provider.

(*Id.* ¶ 141.)

Lucas seeks to hold Hillenbrand, O'Connell, Tarvin, and Farris liable for this altercation and injury because they were on Lucas' "treatment team." (*Id.* ¶¶ 372, 447, 554.) However, he fails to allege that the treatment team or these individual defendants were involved in the rooming process at Warm Springs. (*See generally id.*) Indeed, the Second Amended Complaint is devoid of any mention of the roommate placement process at Warm Springs, (*see generally id.*), and merely implies that the treatment team is involved with this process, (*id.* ¶ 554). The Second Amended Complaint fails to allege that Hillenbrand, O'Connell, Farris, or Tarvin took actions or made omissions in Lucas' placement

41

with a roommate. Accordingly, Lucas fails to state a plausible § 1983 claim under the special-relationship exception.[38]

### b. § 1983 *Monell* Claim Against Corporate Defendants

Lucas' only federal claim against Corporate Defendants is based on a Fourteenth Amendment due process *Monell* claim. (Doc. 41 at ¶¶ 576–625 (Count IV).) "In *Monell,* the Supreme Court held that municipalities and other local government units could be sued for constitutional violations under§ 1983." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (citing *Monell*, 436 U.S. at 690). The Ninth Circuit has since clarified that such liability can extend to private entities so long as a plaintiff shows that ( 1) the private entity "acted under color of state law" and (2) "if a constitutional violation occurred, the violation was caused by an official policy or custom of [the entity]." *Id.* at 1139. Corporate Defendants argue that because Lucas' "pleadings demonstrate his condition was not worse at the time of discharge," (Doc. 28 at 21), he fails to allege a constitutional violation and his *Monell* claims must be dismissed.

In response, Lucas rehashes two of the same arguments discussed above, *i.e.*, his commitment to Warm Springs was indeterminate and the state-created-

---

[38] Under 42 U.S.C. § 1988, courts "may allow the prevailing party" in a § 1983 action to recover "a reasonable attorney's fee." Because Lucas' § 1983 claims against Individual State Defendants fail, his claim for attorney fees under § 1988 necessarily fails as well.

danger exception applies. As to this exception, in his *Monell* claim, Lucas specifically alleges that the conduct of Corporate Defendants "resulted in [Lucas] being discharged from [Warm Springs] in a condition that was more dangerous tha[n] the condition under which [Lucas] was admitted to [Warm Springs]." (Doc. 41 at ¶ 624.) This single allegation is belied by the other 503 allegations in the Second Amended Complaint. As explained above, Lucas does not allege a colorable claim—let alone state a plausible one—under an indeterminant commitment theory or the state-created-danger exception. It is well established that *Monell* claims fail in the absence of an underlying constitutional violation. *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1996) (per curiam)) (explaining "an individual may recover under § 1983 only when his federal rights have been violated"). Because Lucas has failed to state a constitutional violation by an individual actor, his *Monell* claim fails.[39]

## III.    State Law Claims

Lucas alleges the following claims under Montana law: medical negligence against Montana, Corporate Defendants, and Individual State Defendants

---

[39] Because Lucas' § 1983 *Monell* claim fails, his claim for attorney fees under § 1988 necessarily fails as well. Further, because all of Lucas'§ 1983 claims against State Defendants and Corporate Defendants fail, his inapplicability of damage caps claim based on § 1983 also fails.

Hillenbrand, DePasquale, Dr. Damschen, Mattson, Farris, and Fenchak (Count I); loss of chance against Corporate Defendants and Individual State Defendants Hillenbrand, DePasquale, Dr. Damschen, Mattson, Farris, and Fenchak (Count II); and negligence against Corporate Defendants (Count VI).  Corporate Defendants' partial motion to dismiss seeks only to dismiss Lucas' federal claims.  (Doc. 47.) State Defendants, on the other hand, seek to dismiss all claims, and argue that because "no viable federal claim" is set forth in the Second Amended Complaint, "there is no basis to exercise supplemental jurisdiction over the state law claims." (Doc. 50 at 24.)  In response, Lucas argues that because original jurisdiction over his § 1983 claims exists and his state law claims are sufficiently related to these federal claims, "the Court has supplemental jurisdiction over those state law claims." (Doc. 53 at 27.)  Ultimately, to the extent such discretion remains, the Court declines to retain supplemental jurisdiction over Lucas' state law claims.

"When a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh*, 546 U.S. at 514.  "In contrast, when a court grants a motion to dismiss for failure to state a federal claim, the court generally retains jurisdiction to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over pendent state-law claims." *Id.*  Section 1367 "codifies the court-developed pendent and ancillary jurisdiction doctrines under the

label 'supplemental jurisdiction.'" *Artis v. District of Columbia*, 583 U.S. 71, 75 (2018). The supplemental jurisdiction statute states in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

Here, there is federal question jurisdiction over Lucas' § 1983 claim against Individual State Defendants Hillenbrand, O'Connell, Farris, and Tarvin related to his roommate assignment. This claim is within this Court's original jurisdiction because it presents a federal question under 28 U.S.C. § 1331 on the face of Lucas' Second Amended Complaint. *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 31 (2025). However, the state law claims for medical negligence, loss of chance, and negligence do not "'derive from' the same 'nucleus of operative fact' as" this limited federal claim. *Id.* at 27 (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). None of facts central to the roommate claim are common to the state-law claims, which focus on Lucas' mental health treatment and discharge. (*Compare* Doc. 41 at ¶ 554 (roommate assignment claim) *with id.* at ¶¶ 504–39 (medical negligence), ¶¶ 540–43 (loss of chance), ¶¶ 630–722 (negligence).)

Further, of the Individual State Defendants against whom the roommate assignment claim is alleged, medical negligence is only alleged against Hillenbrand and Farris. (*Id.* ¶¶ 504–39.) The central facts of this claim against Hillenbrand are that she failed to "properly investigate the cause of Plaintiff's psychosis and properly treat Lucas' psychosis;" failed to "ensure the providers responsible for monitoring and documenting signs and symptoms of Lucas' psychosis fulfilled their roles;" and failed to act properly with regard to Lucas' discharge. (*Id.* ¶ 510.) The central facts of this claim against Farris are largely based on his "supervisory role" and his "duty to ensure the nurses in his supervision . . . monitor[ed] the signs and symptoms of Lucas' mental health." (*Id.* ¶ 517.) Of the Individual State Defendants against whom the roommate assignment claim are alleged, the loss of chance claim is only alleged against Hillenbrand and Farris for their negligent conduct, which caused Lucas to lose his "opportunity for a better outcome for his mental and physical health." (*Id.* ¶¶ 540–43.) The negligence claim is alleged only against Corporate Defendants. (*Id.* ¶¶ 630–722.) Although the alleged acts comprising the operative facts took place at Warm Springs while Lucas was committed there, "[t]he existence of some factual overlap is not enough." *Salazar v. Thunderbird Restaurants LLC*, 2025 WL 755420, at *3 (D. Ariz. Mar. 10, 2025) (collecting cases). The only claim over which this Court has jurisdiction is the roommate assignment claim by way of the

46

special-relationship exception. The state law claims are based on entirely different operative facts. The state law claims must be dismissed.

But even if a common nucleus of operative fact is assumed, supplemental jurisdiction is declined. Because no federal claims survive under 12(b)(1) or 12(b)(6), the Court "has dismissed all claims over which is has original jurisdiction." *Royal Canin*, 604 U.S. at 32–33 (citing 28 U.S.C. § 1367(c)(3)). Thus, "supplemental jurisdiction persists," but a "district court need not exercise it." *Id.* at 33. It is presumed that "if the federal claims are dismissed before trial," "the state claims should be dismissed as well." *Gibbs*, 383 U.S. at 726. Although, the Ninth Circuit does not require an "explanation for a district court's reasons when the district court acts under" § 1367(c)(1)–(3), *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 478–79 (9th Cir. 1998), "actually exercising discretion and deciding whether to decline, or to retain, supplemental jurisdiction over state law claims when any factor in subdivision (c) is implicated is a responsibility that district courts are duty-bound to take seriously," *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc). Courts "balance" the following "*Gibbs* values" when exercising such discretion: fairness, judicial economy, convenience, and comity. *Id.* (referencing *Gibbs*, 383 U.S. at 724–726).

As to fairness, Lucas states that:

In March 2025, State Defendants urged Lucas to dismiss his state court case and combine the state law claims alleged therein with those alleged

47

in this action. The State claimed it sought to avoid parallel litigation. State Defendants now seek dismissal of those claims – after the September 22, 2025 statute of limitations – on the ground that this Court lacks supplemental jurisdiction. This strategy invites precisely the kind of procedural unfairness doctrines like equitable estoppel intend to prevent.

(Doc. 53 at 27 n.3.) State Defendants and Lucas were ordered to submit supplemental briefing regarding this issue and address "[w]hether Lucas may still timely file his state law claims for medical negligence, loss of chance, and negligence in state court." (Doc. 57.) In their supplemental brief, State Defendants explain that to avoid the "costly and inefficient" prospect of litigating in two forums, "counsel for State Defendants and counsel for Lucas engaged in discussions regarding the potential consolidation of claims in a single action." (Doc. 58 at 2.) Such discussion took place through email, and these emails were provided to the Court. (Doc. 58-1 at 7–9.) In his supplemental brief, Lucas clarifies that he "makes no allegation that the State engaged in any misconduct or made any representations upon which [he] relied in agreeing to dismiss" his state action and acknowledges that the State Defendants' statements about their discussion to dismiss the state case "are accurate." (Doc. 59 at 4.)

In their discussion, State Defendants agreed to waive Eleventh Amendment immunity and to answer pending discovery requests, and Lucas agreed to only proceed against State Defendants in federal court. Consistently, Lucas dismissed his state court action without prejudice. Both parties agree that potential statutes of

limitation were not discussed. (Doc. 58 at 3; Doc. 59 at 1.) Now, State Defendants state that "Lucas may still timely file his state law claims in state court," (Doc. 58 at 4), and assert that they "have no intention of asserting a statute of limitations defense in this case, or in a subsequent state court action based on the same facts, provided the state case is filed within one year of any dismissal from this Court," (*id.* at 3 (citing Mont. Code Ann. § 27-2-407 (Savings Statute)).) Although the Montana Savings Statute's requirement that the action not be "terminated . . . by a voluntary discontinuance," "concern[s]" Lucas because he voluntarily terminated his state court action, this "concern[]" is "assuaged" because "the State has reassured the Court it will not assert a statute of limitations defense." (Doc. 59 at 3–4.)

Further, the state statute of limitations periods for Lucas' state law claims are "tolled" during the pendency of his federal suit. 28 U.S.C. § 1367(d); *Artis*, 583 U.S. at 75 ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, *i.e.,* to stop the clock."). Thus, the statute of limitation periods for his state law claims would have begun tolling on February 26, 2025, when Lucas filed his suit in this Court. (*See* Doc. 1.) Assuming that at the earliest, the state statute of limitations for Lucas' state law claims would not have run until "September 22, 2025[,]" (Doc. 53 at 27 n.3; *see* Doc. 59 at 2–3),

49

under § 1367(d), Lucas will still be able to file his state law claims in state court. Accordingly, this factor weighs in favor of declining supplemental jurisdiction.

In terms of judicial economy and convenience, both parties and the Court have expended substantial time and resources in this case as this suit commenced over one year ago, (Doc. 1), and the adequacy of Lucas' prior pleading was fully litigated, (*see* Doc. 34). However, litigation is still in the early stages in terms of discovery and a trial date has yet to be set. Further, both parties seek to have all claims adjudicated in a single action. (Doc. 58 at 4 ("State Defendants[] . . . desire to have all claims adjudicated in one action."); Doc. 59 ("Plaintiff wishes to avoid litigating in two separate courts[.]").) These factors weigh in favor of declining supplemental jurisdiction as well. As to comity, the remaining claims raise purely state law issues and Montana has a strong interest in deciding such medical claims under its own statutory framework. *See Gibbs*, 383 U.S. at 726 (explaining "[n]eedless decisions of state law should be avoided"). Accordingly, this factor weighs in favor of declining to exercise supplemental jurisdiction.

On balance, the *Gibbs* values weigh in favor of declining to exercise supplemental jurisdiction over Lucas' state law claims. Consistently, exercise of supplemental jurisdiction over Lucas' state law claims is declined.[40]

---

[40] Because supplemental jurisdiction over Lucas' state law claims is declined, supplemental jurisdiction over his related unconstitutional damage caps claim based on the Montana Constitution is also declined.

50

## IV.    Leave to Amend

Lastly, Lucas is not granted to leave to amend. Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, district courts "should freely give leave [to amend] when justice so requires." Consistently, there is a strong presumption in favor of granting leave to amend. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). However, "[l]eave to amend may be denied if the proposed amendment is futile or would be subject to dismissal." *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018). "An amendment is futile when it is clear that the plaintiff cannot plead additional facts that would be sufficient to satisfy *Iqbal*'s pleading standards." *Estate of Sumner v. Cal. Dep't of Corrs.*, 2025 WL 416816, *2 (9th Cir. Feb. 6, 2025) (citing *Sylvia Landfield Tr. v. City of L.A.*, 729 F.3d 1189, 1196 (9th Cir. 2013)).

Here, in its October 24, 2025 Order, the Court dismissed Lucas' prior pleading with leave to amend. (Doc. 34.) In that Order, Lucas was informed that he had "identified the specific allegation that might conceivably save his constitutional due process claim: the presence of state-created or augmented risk." (Doc. 34 at 17.) In his Second Amended Complaint, Lucas pled additional facts that span nearly 60 pages in support of his due process claims under an indeterminate commitment theory or the state-created danger exception but still failed to meet the Rule 12(b)(1) standard. These claims are therefore futile. While

51

additional facts may support Lucas' special-relationship claim based on his roommate assignment, Lucas has already had three bites at the apple. (Doc. 1 (Complaint); Doc. 3 (Amended Complaint); Doc. 34 (Second Amended Complaint).) And, although the special-relationship exception was not expressly raised by Lucas until he responded to the pending motions to dismiss, the October 24, 2025 Order clearly stated that "failure to identify the specific conduct of the individual defendants can be potentially cured with the addition of further factual allegations." (*Id.* at 17.) Despite numerous additional factual allegations, he failed to cure this deficiency. Accordingly, Lucas' claims are dismissed with prejudice.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that State Defendants' motion to dismiss, (Doc. 49), and Corporate Defendants' motion to dismiss, (Doc. 47), are GRANTED. Lucas' federal claims are DISMISSED with PREJUDICE. The Court DECLINES to exercise supplemental jurisdiction over his state law claims. The Clerk is directed to enter Judgment consistent with this Order and close the case.

DATED this 21st day of April, 2026.

Donald W. Molloy, District Judge
United States District Court

52